UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOSEPH J. BRENNAN,

                Plaintiff,

          - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.
-------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**
13-CV-4866 (RRM)

       Plaintiff Joseph Brennan brings this action against defendant Carolyn Colvin, Acting

Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42

U.S.C. § 405(g), seeking review of defendant's determination that plaintiff is not entitled to

disability insurance benefits under Title XVI of the Social Security Act ("SSA").  Plaintiff and

defendant have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c).  (Def.'s Mot. J. Pls. (Doc. No. 16); Pl.'s Mot. J. Pls. (Doc. No. 18).)  For the

reasons set forth below, plaintiff's motion is DENIED and defendant's motion is GRANTED.

## BACKGROUND

### I.    Procedural History

       On June 3, 2009, plaintiff applied for a period of disability and disability insurance

benefits with the Social Security Administration ("SSA"), alleging disability due to asthma,

restrictive airway disease, and a right shoulder injury.  (Admin. R. (Doc. No. 20) at 24, 194.)

Plaintiff alleged that he became unable to work due to his disabilities on February 25, 2009.  (*Id.*

at 194.)  On August 25, 2009, plaintiff's claim was denied.  (*Id.* at 24.)  In response, plaintiff

filed a written request for hearing on April 30, 2010.  (*Id.*)

On December 16, 2011, plaintiff received a hearing with the SSA Office of Disability Adjudication and Review in New York, NY. (*Id.*) Administrative Law Judge ("ALJ") Jack Russak presided over the hearing where plaintiff, an impartial medical expert, and an impartial vocational expert testified. (*Id.*) On December 23, 2011, ALJ Russak issued a decision that plaintiff was not disabled, within the meaning of the Social Security Act, between February 25, 2009, and the date of the decision. (*Id.*) On July 1, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (*Id.* at 1.)

On August 29, 2013, plaintiff filed the instant case against defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration (the "Commissioner"). (Compl. (Doc. No. 1).) On June 17, 2014, plaintiff and defendant cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Def.'s Mot. J. Pls. (Doc. No. 16); Pl.'s Mot. J. Pls. (Doc. No. 18).)

Plaintiff contends that (1) the ALJ and the Appeals Council failed to properly weigh the evidence related to plaintiff's psychiatric impairments, (2) the ALJ failed to properly evaluate plaintiff's credibility, and that (3) the ALJ relied on flawed vocational expert testimony. (Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") (Doc. No. 17) at 10, 14, 17.) Defendant maintains that the ALJ properly found that plaintiff was not disabled. (Def.'s Mem. Supp. Mot. J. Pleadings ("Def.'s Mem.") (Doc. No. 19) at 13.)

## II.    Administrative Record

Plaintiff was employed as a firefighter with the Fire Department of the City of New York (FDNY) from August 1998 through September 2009. (Admin. R. at 195.) Plaintiff's asthma, restrictive airway disease, right shoulder injury, and Post-Traumatic Stress Disorder (PTSD)

stem from his work as a firefighter.  Plaintiff alleges total disability beginning February 25, 2009.  (*Id.* at 194.)

### a. Plaintiff's Asthma and Restrictive Airway Disease Before February 25, 2009

On September 11, 2001, plaintiff was at the World Trade Center in his capacity as a firefighter with the FDNY.  (Admin. R. at 244.)  After the tower's collapse, plaintiff was buried in rubble for approximately 20 minutes, suffering "significant exposure to dust and products of combustion."  (*Id.*)

In May 2004, plaintiff was evaluated for a cough, dyspnea, and irritant sensitivity.  (*Id.*)  A methacholine challenge test was normal and plaintiff returned to full duty with the FDNY.  (*Id.*)  In January 2007, plaintiff took another methacholine challenge test, which revealed vital capacity to be 5.0 (93% of predicted) and one-second forced expiratory volume (FEV1) to be 4.06 (92% of predicted).  (*Id.* at 258–62.)  Plaintiff saw significant improvement in his breathing after being proscribed Pulmicort.  (*Id.* at 244.)  However, in the summer of 2007, he saw a marked exacerbation of his symptoms after weaning himself off of the medication.  (*Id.*)  Plaintiff was restarted on Pulmicort and, again, saw significant improvement in his breathing.  (*Id.*)

On August 2, 2007, a FDNY Medical Board committee recommended that plaintiff be found permanently unfit for firefighting duty due to asthma.  (*Id.* at 244.)  However, pulmonary function testing performed on August 8 and September 8, 2008, were normal.  (*Id.* at 257, 263–66.)  On October 2, 2008, a FDNY Medical Board committee recommended that plaintiff be found permanently unfit for firefighting duty due to asthma.  (*Id.* at 243.)

On December 2, 2008, plaintiff was treated at the Staten Island University Hospital emergency department following an asthma attack.  (*Id.* at 233–39.)  There, plaintiff told doctors

that he experienced a cough, shortness of breath, and trouble breathing after exposure to bathroom cleansers and detergents. (*Id.* at 236.) Plaintiff was treated with Albuterol and Pulmicort. (*Id.* at 237.) He was discharged with a prescription for Prednisone. (*Id.*) Plaintiff was hospitalized again in January 2009 for an asthma attack. (*Id.* at 246.)

### b. Plaintiff's Right Shoulder Injury Before February 25, 2009

In December 2004, plaintiff injured his right shoulder while attempting to open a fire hydrant. (*Id.* at 245.) An MRI revealed right shoulder bursitis and an anterior glenoid labral tear. (*Id.*) Plaintiff failed to respond to conservative treatment. (*Id.*) On March 9, 2005, plaintiff underwent surgery and began a regimen of physical therapy. (*Id.*) Despite the surgery and subsequent physical therapy, plaintiff continued to experience pain, decreased range of motion, and decreased strength. (*Id.*) A second surgery was recommended, but plaintiff declined because of the attendant pain and physical therapy demands. (*Id.* at 49, 245.)

On March 14, 2006, a Medical Board committee of the FDNY recommended plaintiff be found permanently unfit for firefighting duty due to his right shoulder injury. (*Id.* at 245.) In 2008, an MRI revealed that plaintiff additionally had a torn rotator cuff in his right shoulder. (*Id.* at 247.)

### c. Plaintiff's Mental Health Counseling Before February 25, 2009

Though not in his original application for disability benefits, plaintiff alleges he is completely disabled due to PTSD and depression, stemming from his experiences on September 11, 2001. (*Id.* at 24, 43, 284–85.) At some point between September 11, 2001 and February 2009, plaintiff received mental health counseling through the Fire Department Counseling Unit. (*Id.* at 49–50, 326.) Plaintiff stated that he saw a counselor between ten and twenty times, but it was not helpful. (*Id.* at 286.) Plaintiff characterized this counseling as "informal." (*Id.* at 29.)

In 2011, plaintiff reported the "onset of his depression, intrusive recollection of traumatic events, paranoia/suspiciousness, weight loss, insomnia and nightmares, anxiety, change in personality, mood liability, diminished frustration tolerance, hostility/irritability/agitation, psychomotor retardation, anhedonia, feelings of guilt/worthlessness, persistent irrational fears, generalized anxiety, social withdrawal/isolation, decreased energy, poor self-esteem, difficulty thinking/concentrating, flat affect, obsessive-compulsive behavior and suicidal ideation" was in February 2009. (Sherman Letter, Oct. 15, 2011, Admin. R. at 284.) However, no medical evidence prior to 2011 confirms this claim.

### d. Medical Evidence After February 25, 2009

On February 25, 2009, the Board of Trustees of the Fire Department Pension Fund awarded disability retirement to plaintiff. (*Id.* at 242.)

#### i. Dr. Lamberto Flores – Examining Physician

On July 14, 2009, Lamberto Flores, MD, a consultative examiner for the SSA, evaluated plaintiff. (*Id.* at 246–49.) Plaintiff reported a three-year history of asthma, a torn right labrum, which was surgically repaired in March 2005, and a torn rotator cuff, for which he did not undergo surgery. (*Id.* at 246–47.) Plaintiff reported a history of shoulder pain, shortness of breath when walking more than three blocks or climbing more than one flight of stairs, but no difficulty with prolonged sitting or standing. (*Id.* at 247.) He reported that he could not lift more than ten to fifteen pounds. (*Id.*) Plaintiff also reported that he did not smoke or drink alcohol. (*Id.*) Plaintiff stated that he cooked TV dinners and did chores, but could not do his own laundry. (*Id.*) He stated that he passed the day reading, watching television, and using the computer. (*Id.*)

Dr. Flores also conducted a physical examination of plaintiff. (*Id.* at 247–48.) Dr. Flores found that plaintiff did not exhibit wheezing, rhonchi, or rales, and had good bilateral air entry. (*Id.*) He observed that plaintiff had a normal gait, did not require an assistive device to ambulate, and showed full muscle strength in the upper and lower extremities. (*Id.* at 248.) Although plaintiff exhibited some tenderness in his right shoulder, Dr. Flores found that his range of motion was within normal limits and that his hand dexterity and ability to perform fine manipulations was intact. (*Id.*) Based upon his examination, Dr. Flores stated that plaintiff's prognosis was "fair" and concluded that his employment status was limited by plaintiff's inability to engage in full squatting, prolonged walking, stair climbing, or heavy lifting. (*Id.* at 248–49.)

### ii. Dr. George Ayyad – Treating Physician

Dr. George Ayyad, plaintiff's internist, treated plaintiff from 2000 until at least July 15, 2011.[1] (*See id.* at 233, 288–94.) On June 11, 2009, plaintiff visited Dr. Ayyad for chest pain and was referred for an echocardiogram. (*Id.* at 295.) The echocardiogram revealed evidence of mild mitral and tricuspid regurgitation, mild pulmonic insufficiency, dilated left ventricle and atrium, and thickened mitral valve leaflets. (*Id.*) Plaintiff's right ventricle was normal in size and appearance, no pericardial effusion was noted, there were no regional wall motion abnormalities noted, and left ventricular function appeared to be normal. (*Id.*)

In 2010, plaintiff visited Dr. Ayyad again with complaints of pain and swelling in his testicle. (*Id.* at 290–91.) During this visit, Dr. Ayyad noted plaintiff's history of asthma. (*Id.* at

---

[1] The bulk of Dr. Ayyad's records in the Administrative Record, including some of the dates on which he treated plaintiff, are illegible. The Court therefore relies on the parties' memoranda in support of their cross-motions, which do not conflict, in interpreting the records.

290.) Plaintiff visited Dr. Ayyad again on July 15, 2011, with musculoskeletal pain on the right side of his neck. (*Id.* at 288–89.) Dr. Ayyad's notes for that visit also refer to plaintiff's history of asthma. (*Id.* at 288.)

### iii. Dr. Michael Weiden – Treating Pulmonologist

Dr. Michael Weiden, Chief Medical Officer for the FDNY, sat on two of the three medical committees that recommended plaintiff be declared permanently unfit for duty. (*See id.* at 243–44). On September 22, 2011, Dr. Weiden examined plaintiff and noted that plaintiff was assigned to light duty as of September 23, 2011. (*Id.* at 268.) In a handwritten letter to the "Social Security Evaluator," also dated September 22, 2011, Dr. Weiden stated that plaintiff was under his care for asthma and had become permanently disabled on October 2, 2008, "due to the need for frequent medical leave during exacerbations of asthma." (*Id.* at 269.)

### iv. Dr. Ronald Sherman – Examining Psychologist

On October 15, 2011, Dr. Ronald Sherman, a psychologist, evaluated plaintiff.[2] (*Id.* at 284–86.) Plaintiff traveled alone via public transportation from his Staten Island home to Dr. Sherman's office in Manhattan. (*Id.* at 284.) Dr. Sherman reported his findings in a narrative letter. (*Id.* at 284–86.)

At this consultation, plaintiff described his experience at the World Trade Center on September 11, 2001, and the changes in his life that followed. (*Id.* at 284–286.) Plaintiff reported that prior to September 11, he did not abuse alcohol or drugs; however, after September 11, he drank alcohol during the evening to help him sleep due to repeated nightmares. (*Id.* at 285.) He reported loss of interest in golfing and going out to eat, decreased energy, fear and anxiety about terrorist attacks, flashbacks of September 11, survivor's guilt, and suicidal

---

[2] Although the document provides an illegible date for Dr. Sherman's "first treatment," the record contains no mention of any other meeting between Dr. Sherman and plaintiff. (*See* Admin. R. at 273.)

ideation.  (*Id.* at 285–86.)  He stated that his previous counseling in 2009 was unhelpful.  (*Id.* at 286.)

Dr. Sherman observed that plaintiff was alert and oriented, spoke clearly in an organized fashion, and was focused on a wish to return to work as a firefighter.  (*Id.*)  He concluded that plaintiff's mood was depressed and anxious, his affect was sad, his concentration and attention to detail was fair, his short and long-term memory were fair, and his insight and judgment were fair.  (*Id.*)  Dr. Sherman diagnosed PTSD and alcohol abuse secondary to PTSD.  (*Id.*)  He found that plaintiff "was totally disabled emotionally and unable to function in any job in any capacity" and that the "present degree of severity of his mental illness had existed since" February 2009. (*Id.*)

During the October 15, 2011 examination, Dr. Sherman completed a Psychiatric/Psychological Impairment Questionnaire.  With regard to understanding and memory, Dr. Sherman noted that plaintiff had no limitations in his ability to remember locations and work-like procedures; however, his ability to understand and remember one or two-step instructions was mildly limited, and his ability to understand and remember detailed instructions was markedly limited.  (*Id.* at 276.)

With regard to sustained concentration and persistence, Dr. Sherman noted that plaintiff had no limitations in his ability to carry out simple one or two-step instructions.  (*Id.*)  Plaintiff was moderately limited in his ability to make simple work-related decisions.  (*Id.*)  Plaintiff was markedly limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary routine without supervision; work in coordination or proximity to others without being distracted by them; and,

complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 276–77.)

With regard to social interactions, Dr. Sherman noted that plaintiff was mildly limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.* at 277.) Plaintiff was moderately limited in his ability to interact appropriately with the general public. (*Id.*) Plaintiff was markedly limited in his ability to ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (*Id.*)

With regard to adaptation, Dr. Sherman noted that plaintiff had no limitations in his ability to travel to unfamiliar places or to use public transportation. (*Id.* at 278.) Plaintiff was moderately limited in his ability to be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently. (*Id.*) Plaintiff was markedly limited in his ability to respond appropriately to changes in the work setting. (*Id.* at 277.)

Dr. Sherman stated that plaintiff was incapable of even low stress work and would be absent more than three times a week due to his impairments or treatment. (*Id.*) Dr. Sherman referred plaintiff to Dr. Sheila Salama for continuing treatment.[3] (*Id.* at 321.)

### e. Hearing Testimony

#### i. Plaintiff's Testimony

Plaintiff testified regarding his asthma, right shoulder condition, and psychiatric condition. (*Id.* at 43–60.) Plaintiff testified he had no trouble getting up stairways, dressing or

---

[3] Plaintiff first saw Dr. Salama on September 28, 2011, but submitted no records of his treatment to the SSA before his hearing on December 16, 2011. (*Id.* at 30, 321)

showering himself.  (*Id.* at 44.)  He stated he was able to drive and visit friends and relatives on a regular basis.  (*Id.* at 44–45.)  He stated he was a member of the Emerald Society with the FDNY and went to a meeting or a dinner approximately once every two months.  (*Id.* at 46.)

Plaintiff testified that he enjoyed reading, but had lost interest in many of his old hobbies.  (*Id.*)  He later clarified that despite spending a fair amount of his day reading, he would lose his train of thought and get distracted after ten to fifteen minutes.  (*Id.* at 57.)  He stated that he regularly used a computer to read the news or look at his union website, but did not enjoy computer games.  (*Id.* at 46.)  Plaintiff stated that his last vacation was over a year prior when he visited his parents in Cape Cod, Massachusetts.  (*Id.* at 46–47.)  He stated that he had driven there, though he usually only drove locally.  (*Id.* at 44, 47.)  Plaintiff stated that he had a high school education and confirmed that he had no trouble reading, writing, or doing math. (*Id.* at 47.)

Plaintiff testified that he was found unfit for work as a firefighter in 2009 due to his asthma and shoulder injury, and had not made any efforts to find alternative employment.  (*Id.* at 48.)  He stated that he was not looking for work because he did not "feel good" and was putting off a second surgery on his right shoulder due to the significant physical therapy demands and pain he remembered experiencing after his first surgery.  (*Id.* at 48–49.)

Plaintiff stated that he was currently receiving treatment from Dr. Weiden, Dr. Ayyad, and Dr. Salama.  (*Id.* at 49.)  He stated he saw Dr. Weiden every month, Dr. Ayyad every other month, and mentioned he had started treatment with Dr. Salama three months prior.  (*Id.*)  He stated that after September 11 the fire department brought counselors to talk to the firemen, and he had seen a counselor with the FDNY a few times over the years.  (*Id.* at 49–50.)  He stated that he had last seen one of these counselors in February 2009.  (*Id.* at 50.)

Plaintiff testified that he had asthma attacks one to two times a month. (*Id.* at 59.) He stated that his last hospitalization was a little over a year before due to an asthma attack, and that he was currently taking Pulmicort, ProAir, Vicodin, and Trazodone. (*Id.* at 50.) He indicated that he takes Pulmicort and ProAir for asthma and uses Pulmicort daily. (*Id.* at 52.) He indicated that the Vicodin was for the daily shoulder pain he experiences. (*Id.* at 51.) He indicated that the Trazodone was to help him sleep due to his nightmares and September 11 flashbacks. (*Id.*)

Plaintiff stated that he was right handed and suffered pain in his right shoulder daily. (*Id.*) He stated that he could not fully extend his arm over his head, and experienced occasional numbness in his fingers. (*Id.* at 51, 54, 60.) He estimated that he could not lift more than 25 pounds, but could push and pull with his right arm. (*Id.* at 54.)

Plaintiff testified that he suffers from fatigue and is more irritable as a result of his difficulty sleeping. (*Id.* at 57–58.) Plaintiff stated that he has days where he "just can't do anything" at least once or twice a week. (*Id.* at 58.) He stated he suffered suicidal thoughts as recently as one month prior. (*Id.* at 53.)

Plaintiff testified that he lived alone, was able to cook "easy stuff," grocery shop, take out garbage, and make his bed; however, he could not vacuum and he sent his laundry out. (*Id.* at 54–55.) He stated that he generally starts the day by reading the newspaper, going on the computer, and sometimes going to the library. (*Id.* at 56.) He stated that he generally eats at home and stays in most nights, watching TV. (*Id.*)

### ii. Medical Expert Testimony

Dr. Gerald Greenberg,[4] a board certified physician in internal medicine with a subspecialty in pulmonary medicine, testified remotely at plaintiff's disability hearing. (*Id.* at 61–68.) Dr. Greenberg had reviewed plaintiff's medical evidence and listened to his testimony. (*Id.* at 65.) Dr. Greenberg testified over plaintiff's attorney's objections to the use of remote testimony and Dr. Greenberg's lack of familiarity with psychologic or psychiatric medicine. (*Id.* at 63.)

Dr. Greenberg opined that plaintiff's physical impairments did not meet or medically equal any listed impairment. (*Id.* at 66–67.) Dr. Greenberg further opined that plaintiff would be capable of performing sedentary work, with some limitations in his right arm, based on his review of plaintiff's medical records. (*Id.*) It is unclear from the hearing transcript whether Dr. Greenberg's assessment took into account plaintiff's psychiatric impairments.[5] (*Id.* at 67–68.)

### iii. Vocational Expert Testimony

Jay Steinbrenner, a vocational expert, testified at the hearing. (*Id.* at 68–77.) Mr. Steinbrenner based his testimony upon both the record and the testimony that preceded his own at the hearing. (*Id.* at 69.) He testified that plaintiff's past relevant work as a firefighter was classified as skilled, heavy work in the *Dictionary of Occupational Titles*. (*Id.* at 70.) He also testified that plaintiff's previous work as a building maintenance worker was classified as skilled, medium work. (*Id.* at 71.)

The ALJ asked Mr. Steinbrenner to consider a hypothetical person of plaintiff's age, education, and work experience, who could perform medium work, with no more than occasional reaching or gross manipulation with the right, dominant hand. (*Id.* at 71.) The work must not

---

[4] The transcript of the administrative hearing incorrectly identifies Dr. Greenberg as Dr. *Joel* Greenberg. (*Id.* at 37.) Dr. Greenberg's CV states his name as Gerald. (*Id.* at 117.)
[5] At the hearing, plaintiff's attorney asked Dr. Greenberg to confirm that he had "not taken into account the psychiatric component." (Admin. R. at 67.) The transcript records Dr. Greenberg's response as: "I can't give you a [INAUDIBLE]." (*Id.*at 68.)

expose the hypothetical person to extreme cold, heat, wetness, humidity, fumes, odors, dust, hazards, poorly ventilated areas, or chemicals. (*Id.*) The work must also consist of simple, routine tasks with no more than occasional decision-making or exercise of work-related judgment and no more than occasional changes in the work setting. (*Id.*)

Mr. Steinbrenner testified such an individual would be unable to perform any of plaintiff's past relevant work, but could perform other jobs. (*Id.*) He testified that such an individual could work as an usher, lobby attendant, telephone survey worker, or gate guard. (*Id.* at 71–72.) Mr. Steinbrenner testified that, collectively, there were 214,468 people employed in these positions nationally, and 21,001 regionally, which includes all five boroughs of New York City. (*Id.* at 72–73.)

On cross-examination, plaintiff's attorney inquired whether someone who is off task "for up to 15 percent of the workday" would be able to sustain employment. (*Id.* at 75–76.) Mr. Steinbrenner opined that would leave the hypothetical employee at an "85 percent productivity rate," which was still above the 80 percent threshold. (*Id.*) However, he did note that in his experience, an employee performing just above the minimum threshold "would have to improve on that productivity at least on occasions to sustain employment." (*Id.* at 76.)

### f. The ALJ's Decision

In a decision dated December 23, 2011, the ALJ denied plaintiff's claim. (*Id.* at 24–32.) After determining that plaintiff met the insured status requirements of the Social Security Act through December 31, 2013, the ALJ engaged in a five step analysis of plaintiff's claim. (*Id.* at 26–31.)

First, the ALJ found that plaintiff had not engaged in substantial gainful activity since February 25, 2009. (*Id.* at 26.)

Second, the ALJ found that plaintiff had the following severe impairments: asthma, status-post labrum tear of the dominant right-shoulder, right-shoulder rotator cuff tear, and PTSD. (*Id.*)

Third, the ALJ found that plaintiff did not have any impairments or combination of impairments that meet or exceed those listed in 20 C.F.R. Part 404, Subpart B, Appendix 1 which would compel a finding of disability. (*Id.*) *See* 20 CFR §§ 404.1520(d), 404.1525, 404.1526; *see also* 20 C.F.R. § 404.1509. In making this finding, the ALJ stated that plaintiff's shoulder impairment was not a "gross anatomical deformity" and that plaintiff had failed to produce sufficient evidence that despite treatment he experienced asthma attacks occurring at least once every two months. (*Id.*) The ALJ found that plaintiff's mental impairment did not meet this threshold because it did not satisfy two of the "paragraph B" criteria: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (*Id.* at 27.)

Fourth, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform light work, except that he was limited to only occasional reaching, including overhead reaching, with his dominant-right arm, and must avoid exposure to temperature extremes, odors, dusts, gases, fumes, and other respiratory irritants. (*Id.* at 28.) The ALJ found that plaintiff was further limited, based upon his mental impairments, to occasional decision-making, occasional changes to work settings, must work in a low stress environment, and is restricted to performing simple, routine and repetitive tasks. (*Id.*) As a result, he determined that plaintiff did not have sufficient RFC to perform the requirements of his past relevant work. (*Id.* at 30.)

Fifth, the ALJ determined that jobs existed in significant numbers in the national economy that plaintiff could still perform.  (*Id.* at 31.)  Plaintiff was therefore not under a disability, as defined in the SSA.  (*Id.*)

In determining plaintiff's RFC, the ALJ engaged in a two-step process.  (*Id.* at 28.)  At the first step, the ALJ determined that plaintiff suffered from medically determinable impairments which could reasonably be expected to cause the symptoms alleged.  (*Id.* at 28–29.)  At the second step, however, the ALJ determined that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were "inconsistent with the above functional capacity assessment."  (*Id.* at 29.)  The ALJ went on to discuss an MRI conducted in March 2006 which showed that plaintiff had "'no current labral tear' but a 'mild to moderate' partial thickness rotator cuff tear."  (*Id.*)  With regard to plaintiff's asthma, the ALJ pointed to a September 2011 test conflicting with Dr. Weiden's reports.  (*Id.*)

The ALJ determined that based on "a thorough in-person examination . . . and demonstrated familiarity with [plaintiff's] medical history," Dr. Flores's opinion was entitled to substantial weight.  (*Id.*)  By contrast, he determined that Dr. Weiden's opinion was entitled to limited weight because it was "inconsistent with [plaintiff's] objective testing," did not acknowledge the improvement brought upon by plaintiff's asthma medication, did not "specify the frequency and nature of [plaintiff's] alleged 'exacerbations'" of his asthma symptoms, and was contradicted by plaintiff's testimony that he had not had an emergency room visit for an asthma attack for more than one year.  (*Id.* at 29–30.)  The ALJ also determined that Dr. Sherman's testimony was entitled to little weight because, "a review of Dr. Sherman's . . . statements suggests that he relies almost exclusively on [plaintiff's] subjective allegations during

one office visit." (*Id.* at 30.)  The ALJ accorded Dr. Greenberg's opinion "only partial weight," noting that his testimony "failed to cite objective medical evidence or set forth a basis for such a restrictive RFC."  (*Id.*)

### g.  Non-Duplicative Evidence Submitted to the Appeals Council

Following the ALJ's denial of his claim, plaintiff appealed the decision to the Appeals Council.  (*Id.* at 19.)  Plaintiff submitted additional evidence, including treatment notes, medical reports, and prescriptions that pre-dated the ALJ hearing.  (*See id.* at 6.)  Plaintiff also provided Dr. Salama's and Dr. Goldstein's narrative reports.  (*See id.* at 320, 323.)

### i.  Dr. Sheila Salama – Treating Psychologist

On September 28, 2011, following a referral from Dr. Sherman, plaintiff began seeing Dr. Sheila Salama for treatment of PTSD.  (*Id.* at 321.)  After the initial appointment, plaintiff met with Dr. Salama two more times, on October 7 and October 12, 2011.  (*Id.*)  Plaintiff subsequently discontinued his treatment with Dr. Salama because his medical insurance would not cover the cost of her treatment.  (*Id.*)

Plaintiff submitted a narrative report by Dr. Salama regarding his treatment to the Appeals Council on March 28, 2012.  (*Id.* at 320–21.)  Dr. Salama reported that plaintiff had a good relationship with his family, but no support system to handle his PTSD.  (*Id.* at 320.)  She reported that plaintiff suffered recurrent nightmares and drank himself to sleep every night.  (*Id.*)  She further reported that he suffered survivor's guilt and was still grieving for those he lost on September 11, 2001.  (*Id.*)  She stated that she prescribed plaintiff Trazodone to help him sleep.  (*Id.*)

### ii.  Dr. Robert Goldstein – Examining Psychologist

On August 14, 2012, plaintiff submitted a narrative report from Dr. Robert Goldstein who conducted a comprehensive psychiatric examination on plaintiff on July 25, 2012. (*Id.* at 324.) At the examination, plaintiff gave a brief overview of his "normal, happy childhood" and recounted his experience at the World Trade Center on September 11, 2001. (*Id.* at 324–25.) Dr. Goldstein's findings are largely duplicative of Dr. Sherman's and Dr. Salama's reports. He reported that plaintiff suffered from insomnia, nightmares, flashbacks, anxiety, and depression. (*Id.* at 326.) He further reported plaintiff rarely leaves home and had lost touch with many friends. (*Id.*)

Dr. Goldstein submitted a Psychiatric/Psychological Impairment Questionnaire. (*Id.* at 329–36.) In regard to understanding and memory, Dr. Goldstein reported the same findings as Dr. Sherman with the exception of plaintiff's ability to remember locations and work-like procedures. Dr. Goldstein reported that plaintiff was moderately limited in this area, where Dr. Sherman had previously found no limitations. (*Id.* at 276, 332.) In regard to sustained concentration and persistence, Dr. Goldstein reported the same findings as Dr. Sherman with the exception of plaintiff's ability to carry out simple one or two-step instructions. Dr. Goldstein reported that plaintiff was mildly limited in this area, where Dr. Sherman had previously found no limitations. (*Id.* at 276, 332.) In regard to social interactions, Dr. Goldstein reported that plaintiff's ability to interact appropriately with the general public and his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness were markedly limited where Dr. Sherman had previously only found moderate limitations. (*Id.* at 277, 333.) Dr. Goldstein reported improvement in plaintiff's ability to ask simple questions or request assistance, reporting only mild limitations. (*Id.* at 277, 333.) In regard to adaptation, Dr. Goldstein reported that plaintiff's ability to travel to unfamiliar places or use public

transportation was mildly limited, where Dr. Sherman had previously found no limitations. (*Id.* at 278, 334.) Dr. Goldstein additionally reported that plaintiff's ability to set realistic goals or make plans independently had worsened from moderately limited to markedly limited. (*Id.* at 278, 334.)

Dr. Goldstein diagnosed plaintiff with PTSD and Major Depressive Disorder. (*Id.* at 327.) Like Dr. Sherman, Dr. Goldstein found that plaintiff was incapable of even low stress work. (*Id.* at 279, 335.) Dr. Goldstein reported that all of plaintiff's days were "bad days" and that he was completely unable to work. (*Id.* at 335–36.)

### h. The Appeals Council Determination

The Appeals Council considered the additional information provided in plaintiff's exhibit list and concluded that it did not provide a basis for disturbing the ALJ's decision. (*Id.* at 2.) The Appeals Council declined to consider Dr. Goldstein's report, concluding that it represented "new information about a later time" than the ALJ's decision and did "not affect the decision about whether [plaintiff was] disabled on or before December 23, 2011, the date that the ALJ rendered his decision. (*Id.*)

### STANDARD OF REVIEW

### I.    Review of a Denial of Social Security Benefits

In reviewing the final determination of the Commissioner, a court does not determine *de novo* whether the claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Where the Commissioner makes a legal error, a "court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted).  An ALJ's failure to apply the correct legal standard is grounds for reversal.  *See Id.* (citation omitted).  On appeal, the Court conducts a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.  *See Schaal*, 134 F.3d at 500–01.

## II.        Eligibility for Disability Benefits

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see, e.g.*, *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended on other grounds*, 416 F.3d 101 (2d Cir. 2005).  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see, e.g.*, *Butts*, 388 F.3d at 383.

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Social Security Administration's regulations require a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
> [2] If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities.
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

In support of his motion for judgment on the pleadings, plaintiff argues (1) that the ALJ and Appeals Council failed to properly weigh the evidence related to plaintiff's psychiatric impairments, (Pl.'s Mem. at 10); (2) that the ALJ failed to properly evaluate plaintiff's

credibility, (*id.* at 14); and (3) that the ALJ relied of flawed vocational expert testimony, (*id.* at 17).

## I.     Administrative Evaluation of the Source Evidence

Plaintiff challenges the Commissioner's evaluation of the evidence on three grounds. First, plaintiff argues that the Commissioner wrongly accorded "little weight" to Dr. Sherman's opinion. (*Id.* at 10.) Second, plaintiff argues that the Appeals Council erred by failing to consider Dr. Goldstein's report. (*Id.* at 11.) Third, plaintiff argues that both the ALJ and the Appeals Council erred in failing to specify what evidence supported the ALJ's RFC finding. (*Id.* at 13.)

### A. Dr. Sherman's Opinion

The Commissioner did not commit legal error in his decision to accord little weight to Dr. Sherman's opinion. SSA regulations provide criteria upon which an ALJ must rely in determining of how much weight to give a medical opinion. 20 C.F.R. § 404.1527(c). An ALJ must give a treating physician's opinion on the nature and severity of a claimant's impairment controlling weight "if it is 'well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record.'" *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1527(c)(2)). Where the ALJ does not give controlling weight to a medical opinion, he must assess it using the § 404.1527(c) factors to determine how much weight to give the opinion. These factors are: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1527(c)(2)–(6).

While the ALJ is not required to expressly discuss and analyze each of the factors, there must be evidence on the record that the ALJ actually considered them. *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004)) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").  Although the ALJ in this case did not individually address each of the factors proscribed for assessing non-controlling medical opinions, the ALJ's opinion does reflect that he considered them.

With respect to the first factor – the length, nature, and extent of the treatment relationship – the ALJ noted that Dr. Sherman examined plaintiff on only one occasion.  (Admin. R. at 30.)  Dr. Sherman provided plaintiff with an initial consult and a referral.  (Admin. R. at 273.)  He never prescribed plaintiff medication or treatment beyond the initial consultation.  As such, Dr. Sherman was not a treating physician and his opinion was not entitled to controlling weight.

As for the second factor – the evidence in support of the physician's opinion – the ALJ noted that Dr. Sherman relied "almost exclusively on [plaintiff's] subjective allegations during one office visit." (*Id.*)  An ALJ may properly give less weight to the portions of a medical opinion that are based on a claimant's subjective statements rather than objective findings. *Modest v. Astrue*, No. 09-CV-44 (SJ) (JMA), 2012 WL 947652, at *3 (E.D.N.Y. Mar. 20, 2012). Dr. Sherman's report of plaintiff's mental impairment appears to be a narrative of plaintiff's self-reported subjective symptoms.  (Admin. R. at 285–86.)  Dr. Sherman's only observed findings were far less drastic that plaintiff's recitations.  Dr. Sherman observed that plaintiff was alert and oriented; his speech was clear, relevant, and goal directed; his thought context was organized and focused on his wish to return to work as a firefighter; his mood was depressed and anxious; his

affect was sad; his concentration and attention to detail were fair; his short and long-term memory were fair; and his insights and judgment were fair. (Admin. R. at 286.)

With respect to the third factor – the consistency of the physician's opinion with the record as a whole – the ALJ may "rely not only on what the record says, but also on what it does not say." *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983). Here, plaintiff's initial disability application included no mention of PTSD or mental disability. (Admin. R. at 194.) At the time of the ALJ's decision, Dr. Sherman's report constituted the *only* medical evidence in the record even mentioning PTSD. The ALJ noted that although plaintiff testified that he was currently undergoing treatment by Dr. Salama, "he failed to submit any prior psychiatric records, either from [her] or any other [doctor] that would indicate his PTSD is of a disabling nature." (Admin. R. at 30.)

Moreover, Dr. Sherman's ultimate conclusion that plaintiff had been completely disabled since February 1, 2009 was inconsistent with plaintiff's testimony and other medical evidence on the record. Despite Dr. Sherman's finding that plaintiff had marked limitations in his ability to interact with coworkers and supervisors, plaintiff testified that he still attended events with the Emerald Society, socialized with his former FDNY coworkers, and had no problems getting along with family, friends, neighbors, bosses, or other people in authority. (*Id.* at 44–46, 207–08.) At the hearing, plaintiff told the ALJ that he "didn't want to stop work, but the fire department said I was unfit." (*Id.* at 48.) The ALJ inquired into the condition cited by the fire department in that determination, and plaintiff responded "because of my shoulder . . . my pulmonary problems, my lung problems." (*Id.*) Plaintiff notably made no mention of any psychological symptoms affecting his ability or desire to work as a firefighter.

As to the fourth and final applicable factor[6] – whether Dr. Sherman is a specialist – although the ALJ did not explicitly identify Dr. Sherman as a psychologist, he noted his Ph.D. and referred to him at the hearing as a doctor.  (*Id.* at 30, 41.)  Further, the ALJ considered his opinion in the context of evaluating plaintiff's alleged psychological disability.  (*Id.* at 30.)

The record clearly conflicts with Dr. Sherman's report of plaintiff's subjective symptoms. The ALJ's decision to accord little weight to Dr. Sherman's evaluation is supported by substantial evidence.

### B.  The Appeals Council's and Dr. Goldstein's Report

Plaintiff also challenges the Appeals Council's decision not to consider Dr. Goldstein's report.  The regulations direct the Appeals Council to consider "new and material evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).  "Evidence is 'new' if it was not considered by the ALJ and is 'not merely cumulative of what is already in the record,' and it is 'material' if it 'is both relevant to the claimant's condition during the time period for which benefits were denied and probative.'"  *Sistrunk v. Colvin*, No. 14-CV-3208 (JG), 2015 WL 403207, at *7 (E.D.N.Y. Jan. 28, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)).  "Materiality also requires 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently.'"  *Id.* (quoting *Jones*, 949 F.2d at 60).

Dr. Goldstein's report noted that plaintiff "has received a diagnosis of [PTSD] from all of his treating mental health clinicians."  (Admin. R. at 326.)  He goes on to conclude that plaintiff "has not responded favorably to treatment measures and . . . continues to suffer from disabling psychiatric symptoms."  (*Id.*)  Like Dr. Sherman's report, Dr. Goldstein's report is based on

---

[6] No "other factors" have been "brought to the Social Security Administration's attention that tend to support or contradict the opinion."  *See* 20 C.F.R. § 404.1527(c)(6).

plaintiff's subjective statements during a single examination and a review of plaintiff's treatment history, including Dr. Sherman's consultation and the period after it.

For the period leading up to Dr. Sherman's evaluation, Dr. Goldstein relies upon the same evidence as Dr. Sherman – namely plaintiff's subjective statements about that time. The only reference in Dr. Goldstein's report even relating to the period of alleged disability prior to the ALJ's decision is his estimation that plaintiff's symptoms and limitations began in February of 2009. Dr. Goldstein articulates no possible basis for this determination other than plaintiff's statements. His report neither relies on, nor presents, any new medical evidence relating to this time-frame, and is thus cumulative as to this time period.

To the extent that Dr. Goldstein relies on his own observations from his consultation that occurred more than seven months after the ALJ's decision, including his assessment of whether plaintiff has responded to psychiatric treatment, this evidence does not relate to the period prior to the ALJ's decision. The Appeals Council therefore did not err in declining to consider Dr. Goldstein's report.

### C. The Appeals Council and the ALJ's RFC Finding

Plaintiff alleges that neither the ALJ nor the Appeals Council specified what evidence supported the RFC findings of plaintiff's mental limitations.[7] (Pl.'s Mem. at 13.)

In determining plaintiff's RFC, the ALJ was required to provide "a narrative discussion describing how the evidence supports each [of his] conclusion[s]" and to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Johnson v. Colvin*, No. 14-CV-2334 (CM) (JLC), 2015 WL 400623, at *14 (S.D.N.Y. Jan. 30, 2015), *report and recommendation adopted*, 2015 WL 3972378 (June 1, 2015).

---

[7] Plaintiff raises no issues with the physical RFC determination.

Considerations affecting the ALJ's analysis of mental impairments include, "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting."  *Id.*

With respect to plaintiff's alleged psychological impairments, the ALJ concluded that plaintiff had the residual functional capacity to perform light work "in a low stress environment," where he would be "restricted to performing simple, routine, and repetitive tasks," with only "occasional decision-making" and "occasional changes in the work setting."  (Admin. R. at 28.)

In making this determination, the ALJ considered whether plaintiff's mental impairment resulted in "at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."  (*Id.* at 27.)

First, the ALJ determined that plaintiff had "mild restriction" in activities of daily living, noting plaintiff's testimony "that he is able to drive, perform daily chores, read, visit the library, and care for himself."  (*Id.*)  Second, the ALJ determined that plaintiff had "mild difficulties" in social functioning, noting plaintiff's testimony "that he regularly visits his family and friends and travelled to visit his parents in Cape Code [sic] last year."  (*Id.*)  Third, the ALJ determined that plaintiff had "moderate difficulties" with regard to concentration, persistence, or pace.  (*Id.*)  The ALJ found that despite plaintiff's statements "that he sometimes loses his concentration of focus, particularly with reading," plaintiff generally "has no problem reading, writing or doing math." (*Id.*)  Fourth, the ALJ determined that "[plaintiff] has experienced no episodes of decompensation, which have been of extended duration."  (*Id.*)

In further support of his conclusions, the ALJ cited to the fact that plaintiff failed to submit any records from Dr. Salama or any of his current or past treating mental health

providers.[8]  (*Id.* at 30.)  Additionally, the ALJ found plaintiff's "statements concerning the intensity, persistence and limiting effects of his symptoms [were] not credible to the extent they [were] inconsistent with the . . . [RFC] assessment."  (*Id.* at 29.)  *See* infra Section II.

The ALJ's narrative adequately explains his conclusion, and develops the record necessary for the Court to determine that the ALJ's ultimate conclusion was based upon substantial evidence.

## II.      The ALJ's Evaluation of Plaintiff's Credibility

"The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  Where the ALJ rejects a plaintiff's testimony in light of objective medical evidence and other factors he deems relevant, he must explain that decision "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief" and whether his decision is supported by substantial evidence.  *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010) (quoting *Fox v. Astrue*, No. 6:05-CV-1599 (NAM) (DRH), 2008 WL 828078, at *12 (N.D.N.Y. Mar. 26, 2008)).

Having had the opportunity to hear the testimony and observe plaintiff's demeanor, the question of plaintiff's credibility was within the ALJ's discretion.  "After careful consideration of the evidence," the ALJ found "that [plaintiff]'s medically determinable impairments could

---

[8] In some cases, the ALJ must affirmatively develop the administrative record where the record does not provide enough information for the ALJ to resolve the gaps and inconsistencies therein.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).  Although the ALJ notes plaintiff did not submit any evidence from Dr. Salama, his treating psychologist, he also provides no indication that he attempted to contact her. In this case, the ALJ considered the existing psychiatric evidence on the record and plaintiff's statement that his previous counseling in 2009 was "informal."  (Admin. R. at 29.)  Even had the ALJ obtained Dr. Salama's treatment records, it is unlikely they would have provided any significant supplementation to the record given that Dr. Salama had only been treating plaintiff for 3 months at the time of the hearing.  Additionally, the Appeals Council reviewed Dr. Salama's narrative report and did not find that it provided a basis for disturbing the ALJ's determination.  (*Id.* at 2.)

reasonably be expected to cause the alleged symptoms; however, [plaintiff]'s statements concerning the intensity, persistence and limiting effects of his symptoms [were] not credible to the extent they [were] inconsistent with the . . . [RFC] assessment." (Admin. R. at 29.) As discussed above, in many instances the record contradicted plaintiff's subjective reporting of the extent of his symptoms. To that extent the ALJ was warranted in discrediting plaintiff's testimony. The ALJ reasoned that despite plaintiff's "asthma, PTSD, and [] right shoulder impairment . . . . [plaintiff] is able to drive a car, see his friends on a regular basis, read[], and . . . tak[e] care of personal needs and basic day-to-day activities." (*Id.* at 28.) Additionally, the ALJ noted the "remarkable absence" of evidence regarding plaintiff's mental impairment. (*Id.* at 30.) Despite plaintiff's alleged debilitating PTSD beginning in 2009, he sought no treatment between 2009 and 2011. The lack of overall treatment itself contradicts the severity of symptoms claimed by plaintiff.

Importantly, the ALJ did not discredit plaintiff's testimony entirely or without explanation. In fact, when analyzing the severity of plaintiff's asthma, the ALJ actually credited plaintiff's testimony over Dr. Weiden's conflicting report. (*Id.* at 29–30.)

The record contains clear bases for the ALJ's decision to discredit plaintiff's testimony to the extent it was contradicted by more credible evidence on the record. Thus, the ALJ's evaluation of plaintiff's credibility is supported by substantial evidence.

### III.    Adequacy of The Vocational Testimony

Finally, plaintiff argues that the ALJ relied on flawed vocational testimony, in part because the testimony was in response to a hypothetical based upon a flawed RFC assessment. (Pl.'s Mem. at 17.) In light of this Court's finding that the RFC was supported by substantial evidence, plaintiff's argument that the testimony was inadequate because the hypothetical was

based on a flawed RFC assessment is without merit.  Nonetheless, the Court will address plaintiff's specific contentions.

Plaintiff claims that the hypotheticals presented to the vocational expert failed to include limitations in concentration, persistence, and pace.  (Pl.'s Mem. at 17–18.)  However, the Second Circuit has "not specifically decided whether an ALJ's hypothetical question to a vocational expert must account for limitations in concentration, persistence, and pace."  *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).  Nevertheless, where the hypothetical is otherwise supported by evidence in the record, any such error would be harmless.  *Id.* at 152.

Here, the ALJ's mental RFC finding reflected the moderate limitations in concentration, persistence, and pace that the ALJ had previously found.  Plaintiff is correct that the ALJ's hypotheticals limited plaintiff "to simple, routine tasks with low stress defined as only occasional decision-making and only occasional changes in the work setting," where he would only occasionally have to exercise judgment in his work.  (*Id.* at 71.)  These limitations were based on the ALJ's previous findings regarding plaintiff's mental impairments.  (*Id.* at 28.)  In fact, in his third hypothetical to the vocational expert, the ALJ actually clarified that the hypothetical presented was "with the same restrictions of concentration, persistence, and pace emphasis . . . ." (*Id.* 73–74.)

The hearing transcripts show the vocational expert was presented with hypotheticals consistent with plaintiff's limitations, as determined by the ALJ.  Thus the ALJ properly relied on the vocational expert's testimony at plaintiff's hearing.

## CONCLUSION

For the reasons herein, plaintiff's motion for judgment on the pleadings is DENIED, and defendant's motion for judgment on the pleadings is GRANTED.

The Clerk of Court is respectfully directed to enter judgment accordingly, and close this case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
         September 29, 2015

_____
ROSLYNN R. MAUSKOPF
United States District Judge